IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 1, 2021

## IN RE L.F., ET AL.

**Appeal from the Juvenile Court for Franklin County**
**No. 2020-JV-48      Thomas C. Faris, Judge**

_____

### No. M2020-01663-COA-R3-PT

_____

This case involves a petition to terminate parental rights. The petition was filed by the Tennessee Department of Children's Services against the biological mother of three minor children. The petition listed seven grounds for termination of the mother's parental rights. After a final hearing on the petition, the trial court terminated Mother's parental rights, finding five grounds for termination: (1) abandonment by failing to visit; (2) persistence of conditions; (3) substantial noncompliance with a permanency plan; (4) failure to manifest an ability or willingness to parent; and (5) severe child abuse. We affirm the trial court in part, reverse in part, and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in part, Reversed in part, and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Glen A. Isbell, Winchester, Tennessee, for the appellant, Jamye K.[1]

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.      FACTS AND PROCEDURAL HISTORY

---

[1] "Because this appeal involves . . . minor [children], all participants will be identified in a manner that protects the privacy of the minor[s]," such as using only the first name and last initial, or only the initials, of the participants. *In re Bentley D.*, 537 S.W.3d 907, 909 n.2 (Tenn. 2017).

Jamye K. ("Mother") is the biological mother of L.V.F. (born January 2006), K.E.K. (born July 2018), and K.G.K. (born September 2019) (collectively "the children"). Korey K. ("Father") is the biological father of K.E.K. and K.G.K. and the stepfather of L.V.F.[2] L.V.F.'s biological father is deceased.

Prior to the birth of the youngest child, on March 1, 2019, L.V.F.'s school filed a petition for truancy, alleging that she had accrued a high number of unexcused absences. The Tennessee Department of Children's Services ("DCS") investigated the petition. During the investigation, thirteen-year-old L.V.F. stated that she had been sexually abused by Father (her stepfather). Based on these allegations, on March 20, 2019, DCS filed a petition for an *ex parte* no contact order between Father and L.V.F. That same day, the Juvenile Court of Franklin County, Tennessee, entered a restraining and no contact order against Father, barring him from having any contact with L.V.F. Shortly thereafter, the juvenile court ordered the parents to submit to drug screens. Mother and Father both tested positive for several illicit substances. Specifically, Mother tested positive for THC, oxycodone, methamphetamine, and amphetamine.

On March 27, 2019, DCS filed a dependency and neglect petition in the juvenile court. The petition alleged that L.V.F. and K.E.K. were dependent and neglected due to the parents' illicit drug use and L.V.F.'s truancy. On the same day, the juvenile court found that there was probable cause to show that L.V.F. and K.E.K were dependent and neglected. As a result, the court placed the children in DCS custody and permitted Mother to have supervised visitation with the children. Subsequently, the parents waived the adjudicatory hearing on the dependency and neglect petition. On May 13, 2019, the juvenile court entered an order that found there was clear and convincing evidence to show that the L.V.F. and K.E.K. were dependent and neglected. The court also barred Mother from contacting the children but permitted her to attend the children's medical appointments.

On April 16, 2019, prior to the trial court finding that L.V.F. and K.E.K. were dependent and neglected, DCS coordinated with Mother to draft a Family Permanency Plan. The plan detailed several responsibilities for Mother, such as: follow court orders regarding the children and Father, complete alcohol and drug assessments and follow any related recommendations, complete intensive outpatient alcohol and drug treatment, refrain from using any illegal drugs, obtain and show proof of a legal income and a stable residence, and complete a parenting education program. The juvenile court ratified the plan on April 24, 2019.

While L.V.F. and K.E.K. were in DCS custody, Mother and Father continued to have contact. In the summer of 2019, each parent obtained an order of protection against

---

[2] Because Mother is the lone appellant in this case, the focus of this section is on Mother's history in this case.

the other.

In an effort to complete her permanency plan responsibilities, in June 2019, Mother began an intensive outpatient program for drug and alcohol treatment. Eventually, Mother completed the program, but she did not complete the aftercare recommendations. Mother also completed a parenting class program in August 2019. She continued to maintain her residence after L.V.F. and K.E.K. entered DCS custody. However, after a foreclosure in mid to late 2019, Mother relocated to a new residence.

While L.V.F. and K.E.K. remained in DCS custody, K.G.K. was born in September 2019. Approximately one month before K.G.K. was born, in August 2019, Mother had tested positive for methamphetamine, amphetamine, and suboxone. Due to Mother's positive drug test, the juvenile court barred Mother from having any contact with L.V.F. and K.E.K. A few days after K.G.K. was born, DCS filed a petition for legal custody of K.G.K., alleging that she was dependent and neglected and severely abused due to Mother's drug use. Thereafter, the juvenile court found that there was probable cause to show that K.G.K. was dependent and neglected and placed her in DCS custody. Mother waived the adjudicatory hearing for the DCS petition regarding K.G.K. Accordingly, the juvenile court entered an order that found K.G.K. was dependent and neglected and she remained in DCS custody. [3] In a separate order that was entered in November 2019, the juvenile court also determined that Mother was making some progress on her parenting plan responsibilities. As a result, the court permitted Mother to have supervised visitation with the children.

In October 2019, DCS worked with Mother to draft a revised Family Permanency Plan. The revised plan listed all three of the children and included many of the same responsibilities for Mother. Under the revised plan, Mother was also instructed to follow all aftercare recommendations related to her intensive outpatient treatment. She was also tasked with visiting the children for a minimum of four hours per month.[4] The juvenile court ratified the plan on October 30, 2019. Another revised Family Permanency Plan was drafted on January 30, 2020. This revised plan included the same responsibilities for Mother as the previous two plans. Additionally, Mother was required to maintain a home that was "free from substantiated perpetrators." This requirement was added to ensure that the children would remain safely away from Father, who was a substantiated perpetrator at the time the final plan was drafted. The juvenile court ratified the final revised plan on February 19, 2020.

---

[3] The court order finding K.G.K. to be dependent and neglected was silent as to the severe abuse allegation.

[4] The original Family Permanency Plan permitted Mother to visit L.V.F. and K.E.K., but as we previously mentioned, between May and November 2019, Mother was barred from contacting the children outside of their medical appointments.

The juvenile court held a review hearing regarding the children on February 19, 2020. After the hearing, the court determined that Mother was not making progress on her permanency plan responsibilities. As a result, the court suspended Mother's visitation rights and barred her from contacting the children.

On May 26, 2020, DCS initiated the instant case by filing a petition to terminate Mother and Father's parental rights. In its petition, DCS asserted seven grounds for termination of Mother's parental rights: (1) abandonment for failing to provide a suitable home; (2) abandonment for failing to visit the children; (3) abandonment for failing to support the children; (4) persistence of conditions; (5) substantial noncompliance with the Family Permanency Plans; (6) failing to manifest an ability or willingness to parent; and (7) severe child abuse. DCS further alleged that it was in the best interest of the children to terminate Mother's parental rights.

Mother filed an answer to the termination petition on October 22, 2020. In her answer, Mother did not raise a lack of willfulness as an affirmative defense to her alleged failure to visit or support the children.

On November 6, 2020, the trial court held a final hearing on the termination petition. Several witnesses testified at the hearing, including Mother; the DCS family service worker who was assigned to the case, Christina Cremeans; the foster mother for K.E.K. and K.G.K.; and L.V.F., who testified in the trial court's chambers.

Mother testified on her efforts to complete her permanency plan requirements, her history of drug use, and L.V.F.'s allegations of sexual abuse. Mother testified that she believed L.V.F.'s statements about Father sexually abusing her. She stated that she was "in shock" by the allegations and that it was the first time L.V.F. reported any such abuse. Although L.V.F. subsequently recanted her allegations, she reasserted the allegations prior to DCS filing its termination petition. At trial, Mother asserted that she did not encourage L.V.F. to recant her allegations.

In regards to her permanency plan responsibilities, Mother claimed that she was steadily employed since DCS filed its initial dependency and neglect petition. She testified that she worked at several different companies from April 2019 to spring 2020 (when the COVID-19 outbreak began). Although Mother testified that she has maintained constant employment, she also admitted that she is currently receiving unemployment benefits. Regardless, Mother admitted that she did not provide proof of her employment to DCS for several employment positions that she held after the children entered DCS custody. Mother verified that she completed a parenting class program and the initial portion of an intensive outpatient program for alcohol and drug treatment. As support for the children, in May 2020, Mother made a "lump sum" child support payment of $850.00. Thereafter, Mother continued to make regular child support payments while the children remained in DCS custody.

Although Mother completed some of her responsibilities in the Family Permanency Plans, she failed to complete many of the required tasks. At the final hearing, she admitted that she did not complete the aftercare recommendation of the intensive outpatient treatment program. Despite Mother being allowed to visit the children between November 2019 and February 2020, she only visited the children one time during this period. Mother testified that after this period, when a no contact order was reimplemented, Mother did not make any efforts to lift the no contact order.

Mother also testified on certain other permanency plan requirements that she failed to complete. Although Mother obtained a new residence after the children entered DCS custody, she did not provide DCS with information on her new residence. As a result, DCS was unable to verify whether the residence was a "safe and stable household." When questioned on why she failed to maintain contact with DCS, Mother stated that "[t]here was no excuse, I should have."

At the final hearing, Mother was also questioned on her history of drug use throughout the case. Mother was subject to random drug tests throughout the custodial episode. Although Mother passed certain tests, there were multiple instances when she tested positive for illicit substances. At the final hearing, Mother claimed that several of the results, including the drug test that indicated she was using methamphetamine while pregnant with K.G.K., were "false positives" or "inconclusive." Mother further testified that, at times, she refused to submit to drug screens "[b]ecause [she] would have failed." Mother claimed that if she was drug tested on the day of the final hearing, she would not test positive for any illicit substances except for potentially THC. The trial judge questioned whether Mother was under the influence of an illicit substance and ordered a recess for Mother to submit to a drug test. During the recess, Mother took a drug test and tested positive for methamphetamine, amphetamine, THC, and benzos.[5] When the trial court indicated that Mother had failed the drug test, Mother admitted to using several different illegal drugs within a week of the final hearing. After Mother previously stated that she would only test positive for THC, the trial court stated that it found "very little credibility on the part of [Mother]" and that it questioned her statements on her other positive tests being false positives.

Ms. Cremeans testified that she had been involved with the children since L.V.F. and K.E.K. first entered DCS custody. She testified on her role in helping draft and establish Mother's Family Permanency Plan responsibilities, the contents of the Family Permanency Plans, her involvement in the case, and her efforts and Mother's attempts (or lack thereof) to complete the permanency plan requirements. Ms. Cremeans verified that Mother completed her parenting classes and an intensive outpatient program. However,

---

[5] It is evident from the transcript of the proceedings that the Court was referring to unidentified Benzodiazepines simply as "benzos."

she stated that Mother violated several requirements under the plans, including the directive to not allow a "substantiated perpetrator" to live in her home. Ms. Cremeans explained that Mother violated this requirement by allowing Father to live in the home after he was substantiated. She testified that she previously witnessed Father at Mother's residence and outside of the children's medical appointments. She further stated that Mother's contact with Father violated the no contact orders that the parents obtained against each other, which made her home unsuitable for the children.

There were various times throughout the custodial episode when Mother did not respond to Ms. Cremeans or refused to follow the directives of DCS. When Mother was permitted to have therapeutic visitation with the children between November 2019 and February 2020, DCS attempted to contact Mother several times. According to Ms. Cremeans, those attempts were largely unsuccessful. She explained that the no contact order between Mother and the children was reimplemented in February 2020 because Mother was contacting L.V.F. without DCS's permission. She also testified that Mother would not cooperate to allow Ms. Cremeans to verify the suitability of Mother's new home and that Mother never provided proof of an income. Although Mother submitted to random drug screens throughout the custodial episode (many of which indicated Mother was using illegal drugs), Ms. Cremeans testified that there were several instances when Mother would thwart her attempts to conduct drug screens. Although Mother was initially responsive to DCS, near the end of 2019, Mother ceased communicating with Ms. Cremeans.

Ms. Cremeans detailed Mother's recent criminal history. In March 2020, Mother pled guilty to two counts of passing a worthless check. The worthless check offenses took place in January 2019. As a result of her guilty plea, Mother was sentenced to one year of probation. On July 24, 2020 Mother was arrested for fabricating or tampering with evidence and for possession of drug paraphernalia. Her arrest resulted in an additional charge for violating her probation. At the time of the final hearing in November 2020, these charges were pending.

The foster mother for K.E.K. and K.G.K.[6] also testified at the final hearing. The foster mother stated that K.E.K. was initially placed in a separate foster home and that he entered her home in October 2019. K.G.K. entered the foster mother's home in September 2019, only a few days after she was born. She testified that K.G.K. had feeding and stomach issues when she first entered the home. However, by the time of the final hearing, those concerns had been remedied. The foster mother stated that both K.E.K. and K.G.K. are doing "excellent" in the home and that they have bonded with the foster family. The foster mother further testified that she had allowed Mother to contact her ever since the children entered her custody. Despite her welcoming communication with Mother, she stated that Mother contacted her only two times since K.E.K. and K.G.K entered her custody. The foster mother stated that her family would "[a]bsolutely" adopt K.E.K. and

---

[6] L.V.F. was placed in a separate foster home than the other children.

K.G.K. if they become available for adoption.

The last witness to testify at the final hearing was L.V.F., who testified in the trial court's chambers. L.V.F. testified on the events regarding her sexual abuse allegations against Father. She stated that Mother did not know about the abuse until after L.V.F. informed the authorities. According to L.V.F., when Mother learned of the allegations, "she just kind of shook her head . . . [and] acted like it was not a big deal." She explained that Mother encouraged her to recant her allegations and that "[Mother] made [her] feel terrible." Despite Mother encouraging L.V.F. to recant her allegations, L.V.F. reaffirmed that the abuse did occur.

L.V.F. also stated that she wants the termination proceeding to go forward and that she is comfortable with K.E.K. and K.G.K. being adopted. When asked whether she wanted to be adopted, L.V.F. stated that she wanted to remain near her siblings.[7]

At the conclusion of the final hearing, the trial court rendered an oral ruling. Its ruling was memorialized in a written order that was entered on December 3, 2020.

In its written order, the trial court found that Mother's testimony was not credible and that DCS established multiple grounds for termination of her parental rights. Specifically, the court found five grounds for termination: (1) abandonment by failing to visit; (2) persistence of conditions; (3) substantial noncompliance with the permanency plans; (4) failure to manifest an ability or willingness to parent; and (5) severe child abuse. Under its severe child abuse finding, the court explained that Mother failed to protect L.V.F. by pressuring her to recant her statements and by continuing to associate with Father. Additionally, the trial court found that DCS failed to establish the grounds of abandonment by failing to provide a suitable home and abandonment by failing to provide support.[8] Having found multiple grounds to terminate Mother's parental rights, the trial court further found that termination of Mother's rights was in the best interest of the children. As a result, the court terminated Mother's parental rights.[9]

Mother timely appealed.

## II. ISSUES PRESENTED

Mother raises two issues on appeal, which we have reworded:

---

[7] Ms. Cremeans explained that L.V.F. has "mixed feelings about adoption" because she has a "strict criteria for what she wants for her future."

[8] On appeal, DCS does not take issue with the trial court's findings on these grounds.

[9] The trial court also terminated Father's parental rights, finding seven grounds for termination: (1) abandonment by failing to provide a suitable home; (2) abandonment by failing to visit; (3) abandonment by failing to support; (4) persistence of conditions; (5) substantial noncompliance with the permanency plans; (6) failure to manifest an ability or willingness to parent; and (7) severe child abuse.

1. Whether DCS established grounds to terminate Mother's parental rights; and

2. Whether it is in the best interest of the children to terminate Mother's parental rights.

For the reasons stated herein, we affirm the trial court's decision to terminate Mother's parental rights, reverse the finding of "severe child abuse" as a ground for termination, and remand.

## III. STANDARDS IN PARENTAL TERMINATION CASES

"A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). However, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

A party wishing to terminate the parental rights of another must prove two elements: (1) that there is at least one ground for termination; and (2) that terminating parental rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). To ensure a parent's fundamental liberty interest is adequately protected, certain procedural safeguards are afforded to parents in termination cases. *In re Carrington H.*, 483 S.W.3d at 522. One such safeguard is that the petitioner must prove both elements by clear and convincing evidence. *Id.*; *In re Dakota C.R.*, 404 S.W.3d 484, 496 (Tenn. Ct. App. 2012). Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) (citations omitted). It must "eliminate[] any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010))

In regard to this Court's role in cases that involve the termination of parental rights:

> Rule 13(d) of the Tennessee Rules of Appellate Procedure supplies the standard that governs an appellate court's review of a trial court's determination in a parental termination proceeding. Under Rule 13(d), appellate courts review factual findings de novo with a presumption of correctness, unless the evidence preponderates otherwise. A trial court's determination as to whether facts amount to clear and convincing evidence supporting termination of parental rights is a conclusion of law. As such, an

- 8 -

appellate court reviews this determination de novo, affords no deference to the trial court's decision, and makes its own determination about whether the facts amount to clear and convincing evidence of the elements necessary to terminate parental rights.

*In re Neveah M.*, 614 S.W.3d 659, 673-74 (Tenn. 2020) (citations omitted).

## IV. DISCUSSION

At the outset of our discussion, we note that the termination of Father's parental rights is not a subject of this Opinion. Shortly after the children entered DCS custody, Father ceased responding to inquiries by DCS or his attorney. Father was absent from the final hearing on the termination petition, and his counsel indicated that he had not spoken with Father for an extended period of time. After the trial court entered its final written order that terminated the parents' parental rights, Father did not file a notice of appeal. Despite his absence and lack of communication, counsel for Father filed a brief on his behalf. In the brief, Father's counsel states that he has not spoken with Father for a significant period of time and that, as a result, he cannot say whether Father opposes the termination of his parental rights.

In a proceeding involving the potential termination of parental rights, our Supreme Court has stated that "no appeal should be taken . . . without specific authorization from the client." *In re Bentley D.*, 537 S.W.3d at 914, 914 n.7 (discussing other states that "have confirmed the importance of a party's consent to an appeal in a termination of parental rights case"). As we stated, Father did not appear for the final hearing. Father's counsel states that there has been a lack of contact with his client and that he "cannot say whether [Father] opposes the termination of parental rights." He goes on to state that he did not have "specific authorization" to file a notice of appeal on behalf of Father, but avers that he has the authority to contest the court's findings against Father based upon this Court's ruling in *In re David S.*, No. E2019-01190-COA-R3-PT, 2020 WL 1303733 (Tenn. Ct. App. Mar. 18, 2020). We disagree. In *In re David S.*, the trial court terminated the parental rights of both parents. *Id.* at *3. Although the father took the appropriate steps to challenge the trial court's decision, the mother did not make an appearance in the appeal or participate in the appeal in any way. *Id.* at *4. Prior to the final hearing, despite receiving service of process, "[the m]other *was not provided any date* regarding the initial hearing." *Id.* at *7. On appeal, this Court determined that the mother did not receive sufficient notice of the termination proceedings and "was never properly served." *Id.* at *4. Although the mother did not make an appearance or otherwise participate in the appeal, this Court stated that "considerations of due process and fundamental fairness require us to address the manner in which [the m]other's parental rights were terminated." *Id.* However, in the present case, the record indicates that Father received adequate service of process for the termination proceedings. After filing its petition to terminate the parents' parental rights, DCS and the trial court took the appropriate steps to ensure that Father received service by publication.

- 9 -

*See* Tenn. Code Ann. §§ 21-1-204 (stating the requirements to serve a party by publication), 37-1-125(a) (stating that a party to a juvenile court proceeding may be served by publication under § 21-1-204 "[i]f, after reasonable effort, [the] party cannot be found, or the party's postal address cannot be ascertained, regardless of whether the party is within this state"). The trial court appointed counsel for Father and then specifically found that "[p]ublication was completed for proper service regarding [Father]." As such, the concerns in *In re David S.* are not present here.

Because there is no indication in the record that Father authorized his counsel to proceed with an appeal on his behalf, it is appropriate for this Court to disregard the brief filed on his behalf. We believe that our holding "strikes the appropriate balance between protecting the fundamental rights of parents and acting in the best interests of children." *In re Bentley D.*, 537 S.W.3d 907, 914-15 (Tenn. 2017). *See also In re Carrington H.*, 483 S.W.3d at 533 ("Due process unquestionably requires States to provide parents with fundamentally fair procedures, but it does not require States to ignore the other interests at stake in parental termination proceedings.").

Although the termination of Father's parental rights is not at issue in this appeal, we will proceed to review the trial court's decision to terminate Mother's parental rights.

### A. Grounds for Termination

According to the Supreme Court's directive in *In Re Carrington H.*, "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings." 483 S.W.3d at 525-26. In this case, the trial court found that there were five grounds for termination of Mother's parental rights. Therefore, we will address each ground in turn.

### 1. Abandonment by Failing to Visit

In Tennessee Code Annotated section 36-1-113(g), abandonment is listed as the first potential ground for termination of parental rights.[10] The statutory scheme provides several alternative definitions of abandonment in Tennessee Code Annotated section 36-1-102(1), including situations when a parent fails to visit his or her child. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i). Under section 36-1-102(1)(A)(i), "abandonment" occurs when a parent fails to visit the child for a period of four consecutive months immediately preceding the filing of a petition to terminate parental rights. *Id.*

DCS initiated the present case by filing its termination petition on May 26, 2020.

---

[10] The portions of the Code discussed in this Opinion are cited according to how they appeared when DCS initiated this case on May 26, 2020.

Accordingly, the relevant four-month period under Tennessee Code Annotated section 36-1-102(1)(A)(i) is from January 26, 2020, to May 25, 2020. It is undisputed that Mother did not visit the children at any point during this four-month period. In fact, Mother's only visit with the children after they entered DCS custody took place in November 2019, outside of the relevant four-month period. Mother failed to visit the children despite DCS making multiple attempts to arrange therapeutic visitations. At the final hearing, Ms. Cremeans testified that she made several attempts to contact Mother between November 2019 and February 2020. Mother admitted that she failed to remain in contact with DCS.

On appeal, Mother argues that her failure to visit the children is excused because of the no contact order between Mother and the children that was reimplemented on February 19, 2020. Mother's argument fails to recognize that approximately one month of the applicable four-month period took place prior to the no contact restriction being reimplemented. During that time, Mother did not make efforts to coordinate visits with DCS. Further, the no contact order between Mother and the children raises the issue of whether Mother's failure to visit was willful. "Effective July 1, 2018, the General Assembly amended Tennessee Code Annotated [section] 36-1-102(1) to render the absence of willfulness to be solely an affirmative defense . . . ." *In re Jude M.*, 619 S.W.3d 224, 236 (Tenn. Ct. App. 2020). Meaning, because this case was initiated in May 2020, DCS was not required to prove that Mother's failure to visit was "willful" in order to establish the ground of "abandonment" under subsection -102(1)(A)(i). Instead, Mother was permitted to raise a lack of willfulness as an affirmative defense to abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(I). However, in Mother's answer to the termination petition, she did not raise a lack of willfulness as an affirmative defense. As a result, she has waived this issue. *See Pratcher v. Methodist Healthcare Memphis Hosps.*, 407 S.W.3d 727, 735 (Tenn. 2013) (citing Tenn. R. Civ. P. 12.08) (stating that "[a]s a general rule, a party waives an affirmative defense if it does not include the defense in an answer or responsive pleading"); *In re Imerald W.*, No. W2019-00490-COA-R3-PT, 2020 WL 504991, at *4 n.5 (Tenn. Ct. App. Jan. 31, 2020) (stating that a parent waives a lack of willfulness as an affirmative defense when the parent fails to raise the defense at trial).[11]

It is undisputed that Mother did not visit the children during the applicable four-month period under Tennessee Code Annotated section 36-1-102(1)(A)(i). Additionally, Mother waived a lack of willfulness as an affirmative defense to abandonment. Accordingly, we affirm the trial court's conclusion that Mother abandoned the children by failing to visit.

## 2. Persistence of Conditions

"Persistence of conditions" is another ground for termination of parental rights.

---

[11] We also note that, at the final hearing, Mother admitted that she made no efforts to lift the no contact order.

Under Tennessee Code Annotated section 36-1-113(g)(3)(A), the ground of "persistence of conditions" is present when:

> The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

The necessary order of removal is "the threshold consideration" for this ground. *In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015). The failure to remedy the conditions that led to the removal need not be willful. *In re Jaylah W.*, 486 S.W.3d 537, 556 (Tenn. Ct. App. 2015). The "persistent conditions" may include the original conditions that caused the child to be removed from the parent's custody or others that "in all reasonable probability would cause a child to be subjected to '*further* abuse and neglect.'" *In re Audrey S.*, 182 S.W.3d at 872 (citing Tenn. Code Ann. § 36-1-113(g)(3)(A)(i)). When DCS's sustained efforts to "improve the parenting abilities . . . have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000).

Turning our attention to the facts of this case, L.V.F. and K.E.K. were removed from Mother's custody on March 27, 2019, after DCS filed a petition that alleged they were dependent and neglected. In September 2019, a few days after K.G.K. was born, DCS filed another petition that alleged K.G.K. was dependent and neglected due to Mother's drug use during her pregnancy. On September 10, 2019, the juvenile court removed K.G.K. from Mother's custody, finding that there was probable cause to show that she was dependent and neglected. The petition to terminate Mother's parental rights was filed on

- 12 -

May 26, 2020 and the final trial occurred on November 6, 2020. Therefore, all three of the children were clearly removed from Mother's custody for more than six months. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A).

L.V.F. and K.E.K. were removed from Mother's custody after Mother tested positive for several illegal drugs. After Mother waived an adjudicatory hearing, the juvenile court adjudicated L.V.F. and K.E.K. dependent and neglected on May 13, 2019. Similarly, K.G.K. was removed from Mother's custody after Mother tested positive for multiple illegal drugs while she was pregnant with K.G.K. K.G.K. was adjudicated dependent and neglected by the juvenile court on November 5, 2019. The record is clear that Mother's drug issues continued to persist up until the final hearing.

Although Mother completed intensive outpatient treatment for her illegal drug use, she did not complete the aftercare component of the program. Additionally, Mother asserts that multiple negative drug screens indicate that she made attempts to adjust the circumstances of her life. Mother is correct in that she passed multiple drug screens in August 2019. However, as a whole, the record indicates that Mother's drug use persisted after the children entered DCS custody. Since the children entered DCS custody, Mother failed several drug tests, often testing positive for methamphetamine, amphetamine, and THC. At the final hearing, Mother admitted that she often refused to submit to drug screens because she knew that she would have failed. On the day of the final hearing, Mother submitted a drug test and tested positive for methamphetamine, amphetamine, THC, and benzos. Thereafter, Mother testified that she used several illegal drugs less than a week before the hearing.

Aside from Mother's drug use, other conditions persisted to prevent the safe return of the children to Mother's custody. At the time of the final hearing, Mother was on probation and had pending criminal charges for fabricating or tampering with evidence and for possession of drug paraphernalia. Additionally, Ms. Cremeans testified that Mother's previous home was unsuitable for the children because Mother continued to associate with Father, which violated no contact orders between Mother and Father. Although Mother later moved to a new residence, she did not allow Ms. Cremeans to examine the home to verify its suitability. Regardless of whether Ms. Cremeans examined the physical aspects of the new home, Mother continues to use illegal drugs and engage in criminal activity. As a result, Mother's inability to provide a suitable home is a condition that continues to prevent the safe return of the children.

Considering the length of time that the children have been in DCS custody, and the sustained efforts by Ms. Cremeans to help improve Mother's circumstances, we find that "[t]here is little likelihood that these conditions will be remedied at an early date so that the child[ren] can be safely returned to [Mother] in the near future." *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii); *see also In re T.S.*, 2000 WL 964775, at *7. Many of Ms. Cremeans's efforts to assist Mother were either unsuccessful or thwarted by Mother.

- 13 -

Pursuant to section 36-1-113(g)(3)(A)(iii), we further find that the continuation of the children's relationship with Mother would "greatly diminish[] [their] chances of early integration into a safe, stable, and permanent home." K.E.K. and K.G.K. are thriving in a pre-adoptive home. The young children have bonded with the foster family, and the foster mother indicated that the family intends to adopt them if they become available. Although L.V.F. has "mixed feelings" about being adopted, placement of the children in a pre-adoptive foster home is not required to find that the final element of persistence of conditions under Tennessee Code Annotated § 36-1-113(g)(3)(A)(iii). *See, e.g.*, *In re Kayden A.*, No. W2020-00650-COA-R3-PT, 2021 WL 408860, at *2, *10 (Tenn. Ct. App. Feb. 5, 2021); *In re Bryson B.*, No. E2019-00729-COA-R3-PT, 2019 WL 6487241, at *5-6 (Tenn. Ct. App. Dec. 2, 2019); *In re Jeffery B.*, No. W2012-00924-COA-R3-PT, 2012 WL 4854719, at *15, *18 (Tenn. Ct. App. Oct. 12, 2012). Despite the tumultuous nature of this case, L.V.F. is described as an intelligent, mature, and goal-oriented child who earns high grades in school. Although she is hesitant about the prospect of adoption, L.V.F. has flourished since entering DCS custody. "The purpose behind the 'persistence of conditions' ground for terminating parental rights is 'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Jaylah W.*, 486 S.W.3d at 556 (quoting *In re Dakota C.R.*, 404 S.W.3d at 499). Accordingly, the continuation of the children's relationship with Mother greatly diminishes their chances of integrating into a "safe, stable, and permanent home."

For these reasons, we find that DCS has satisfied the elements of Tennessee Code Annotated section 36-1-113(g)(3). Thus, we further find that it has established "persistence of conditions" as a ground for termination of Mother's parental rights.

### 3. Substantial Noncompliance with the Permanency Plans

In Tennessee, DCS is required "to prepare a permanency plan for each child in foster care under its supervision." *In re K.F.*, No. M2008-01742-COA-R3-PT, 2009 WL 1025829, at *6 (Tenn. Ct. App. Apr. 14, 2009). Permanency plans are developed to help ensure each foster child receives adequate care. *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *7 (Tenn. Ct. App. July 13, 2015). Under Tennessee Code Annotated section 36-1-113(g)(2), one potential ground for termination of parental rights is present if "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." To terminate a parent's parental rights under this ground, the parent's noncompliance with the plan must be substantial and the plan's requirements must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002).

Analyzing a parent's compliance with a permanency plan "involves more than merely counting up the tasks in the plan to determine whether a certain number have been

- 14 -

completed[.]" *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d at 547) (emphasis added). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 293 (Tenn. Ct. App. 2006). Instead, DCS must show "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)). When analyzing this ground, "[o]ur concern is with the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes." *In re Daniel B., Jr.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *5 (Tenn. Ct. App. July 10, 2020) (citing *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009)) (emphasis added).

In the present case, three versions of a Family Permanency Plan were developed and ratified by the juvenile court. The plan was first drafted on April 16, 2019, and ratified on April 24, 2019. The initial version of the plan listed L.V.F. and K.E.K. as the subject children. On October 8, 2019, the plan was revised to list all three of the children. The juvenile court ratified the revised plan on October 30, 2019. The plan was revised a final time on January 30, 2020, and ratified on February 19, 2020. The three versions of the plan included several requirements for Mother, including following court orders regarding the children and Father, completing alcohol and drug assessments and following any related recommendations, completing intensive outpatient alcohol and drug treatment and following all aftercare recommendations, refraining from using any illegal drugs, obtaining and showing proof of a legal income and a stable residence, completing a parenting education program, visiting the children on a regular basis, and maintaining a home that was "free from substantiated perpetrators." The children entered DCS custody due to Mother's use of illegal drugs and due to concerns regarding her ability to care for and protect the children. We find Mother's responsibilities under the permanency plans reasonable and related to remedying those conditions.

During the children's time in DCS custody, Mother has made minimal efforts to complete her permanency plan requirements. Although she completed an intensive outpatient program for drug and alcohol treatment, she never participated in the recommended aftercare treatment. At the final hearing, Mother claimed that she did not complete the treatment because she went into labor with K.G.K. However, the trial court explicitly found that Mother's testimony was not credible, and we afford considerable deference to the weight and credit that a trial court places on a witness's testimony. *See Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). Similarly, Mother claimed that she sent DCS proof of her employment, but Ms. Cremeans testified that no such proof was provided. The final version of the permanency plan instructed Mother to regularly visit the children. As we previously discussed, Mother visited the children only one time since they entered DCS custody, and she admitted to making no efforts to lift the February 2020 no contact

order regarding the children. Further, Mother did not make efforts to satisfy the requirements related to establishing a suitable home. Initially, she continued to allow Father to frequent her residence, which violated no contact orders between the parents. According to Ms. Cremeans, the parents' violation of the no contact orders made the home unsuitable by DCS standards. When Mother changed residences, she did not contact DCS to allow Ms. Cremeans to examine the suitability of the home.

As we have discussed at length, Mother's illegal drug use has persisted since the children entered DCS custody. She tested positive for illegal drugs several times throughout this case, including the day of the final hearing. Considering the primary concern when the children entered DCS custody was Mother's drug use, we find the directives to abstain from illegal drug use and to complete all treatment recommendations particularly important. Therefore, Mother's noncompliance with the drug-related responsibilities under the plans was substantial.

Taken together, we cannot say that Mother's noncompliance with the permanency plans was simply "[t]rivial, minor, or technical deviations" from the requirements. *See T.M.B.K.*, 197 S.W.3d at 293. Instead, we find that Mother's noncompliance was substantial. Therefore, we affirm the trial court's finding that there was clear and convincing evidence to terminate Mother's parental rights under Tennessee Code Annotated section 36-1-113(g)(2).

### 4. Failure to Manifest an Ability or Willingness to Parent

The next ground that we must address is listed in Tennessee Code Annotated section 36-1-113(g)(14). This section of the Code states that parental rights may be terminated when:

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). As indicated in the text of subsection 113(g)(14), to succeed under this ground, a petitioner must prove two elements by clear and convincing evidence. First, the petitioner must prove that the "parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." *In re Neveah M.*, 614 S.W.3d at 674. Second, the petitioner must establish that "placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *Id.*

- 16 -

In *In re Neveah M.*, the Tennessee Supreme Court detailed the proper interpretation of the first element of this ground. *Id.* at 674-75. The Court stated that the petitioner satisfies the first element of this ground if "a parent or guardian has failed to manifest either [an] ability or willingness" to parent the child. *Id.* at 677. Meaning, this element places "a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.*

Applying the Supreme Court's directive in *In re Neveah M.* to the facts of this case, we find that Mother failed to manifest an ability and willingness to assume custody or financial responsibility of the children. When considering whether the parent has demonstrated an *ability*, "we focus on 'the parent's lifestyle and circumstances.'" *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). When analyzing the *willingness* of a parent, "we look for more than mere words" and consider whether the parent has attempted "to overcome the obstacles that prevent [her] from assuming custody or financial responsibility of the child." *Id.* "A lack of effort can undercut a claim of willingness." *Id.*

Mother has failed to manifest an ability to assume custody of the children due to her ongoing drug use and her unresolved legal issues. Similarly, although she claims that she was employed at various times throughout this case, at the time of the final hearing, she admitted that she was no longer employed and that she was reliant on unemployment assistance. Mother's claim that she is willing to regain custody and financial responsibility of the children appears to be mere words. Recent events indicate that she continues to live an unstable lifestyle that is filled with illegal drug use and criminal activity. Rather than attempt to overcome these obstacles, Mother admitted that she made no effort to lift the no contact order that was implemented in February 2020. Therefore, we find that there is clear and convincing evidence to support the trial court's conclusion regarding the first element of this ground.

For similar reasons, we further find that there is clear and convincing evidence to show that placing the children in the custody of Mother would subject them to a risk of substantial harm. Mother's current lifestyle is not the appropriate setting for raising children. She continues to use illegal drugs and has pending criminal charges. These unresolved issues present "a real hazard or danger that is not minor, trivial, or insignificant." *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (quoting *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018)). In contrast, the children are thriving in their current foster placements. Although L.V.F. is placed in a separate foster home than K.E.K. and K.G.K., she is receiving high grades in school, is receiving regular counseling, and has exhibited mature and goal-oriented aspirations. K.E.K. and K.G.K. have bonded with their foster family and have adapted well to entering a new home.

K.G.K. entered the foster home with health concerns, but the foster mother explained that those concerns have subsided and that she is healthy. Considering the record as a whole, we agree with the trial court that returning the children to Mother's custody would likely cause the children substantial physical or psychological harm.

In sum, we find that DCS satisfied both prongs of Tennessee Code Annotated section 36-1-113(g)(14) as a ground for termination of Mother's parental rights. Therefore, we affirm the trial court's conclusion regarding the ground of failure to manifest an ability or willingness to parent the children.

### 5. Severe Child Abuse

Pursuant to Tennessee Code Annotated section 36-1-113(g)(4), a court may terminate a parent's parental rights when "[t]he parent . . . has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child." Under section 37-1-102, there are five alternative definitions of "severe child abuse." *See* Tenn. Code Ann. § 37-1-102(b)(27)(A)-(E). In its brief on appeal, DCS concedes that "[t]he trial court did not specify which of those definitions it was relying on[.]"

This Court reviewed a similar order in *In re S.S.-G.*, No. M2015-00055-COA-R3-PT, 2015 WL 7259499 (Tenn. Ct. App. Nov. 16, 2015). We noted that the ground of severe child abuse contained in Tennessee Code Annotated section 36-1-113(g)(4) "refers to definitions contained in another statute, i.e., Tennessee Code Annotated Section 37-1-102." *Id.* at *12. We explained that "Tennessee Code Annotated Section 37-1-102(b)(21)[12] contains several definitions of what constitutes 'severe child abuse' for purposes of termination of parental rights under Tennessee Code Annotated Section 36-1-113(g)(4)." *Id.* In *In re S.S.-G.*, the trial court had "failed to specify the particular definition of 'severe child abuse' upon which it relie[d]." *Id.* It did generally cite Tennessee Code Annotated Section 37-1-602, but again, that statute also contained many definitions of what constitutes "child sexual abuse." *Id.* Even taking these references together, "the trial court did not specifically list the exact definition(s) it relied upon in reaching its conclusion that termination of Appellant's parental rights was warranted on grounds of severe child abuse." *Id.* After considering this Court's holdings regarding other grounds for termination and the necessity of specific findings, we concluded that "[w]here the statute provides several possible definitions for a ground, the trial court must specify the exact definition that it relies upon in reaching its ultimate conclusion. In the absence of such specificity, this Court cannot conduct a meaningful appellate review." *Id.* Ultimately, we concluded that because the code sections the trial court relied on contained "numerous definitions" of severe child abuse and child sexual abuse, "in the absence of specific citation to the exact

---

[12] The definition of "severe child abuse" has since been redesignated as subsection (b)(27).

definition(s) relied upon, we cannot make a meaningful review of the trial court's decision." *Id.* at *1. The same is true here. The trial court only generally mentioned that Father "sexually abused" the child and that Mother "failed to protect" her, and it referenced only 36-1-113(g)(4) and 37-1-102(b)(27). Thus, it is not clear from the order whether the trial court relied on one of the many offenses listed in definition (C) or some other definition.

In *In re S.S.-G.*, the ground of severe child abuse was the only remaining ground for possibly terminating parental rights, so we vacated and remanded for specific findings by the trial court. *Id.* Because the case before us involves four other grounds that we have already found were proven by clear and convincing evidence, we do not deem it necessary to remand for further consideration of this ground. *See, e.g.*, *In re Adaleigh M.*, No. E2019-01955-COA-R3-PT, 2021 WL 1219818, at *9 (Tenn. Ct. App. Mar. 31, 2021) ("Because four other statutory grounds support termination of Father's and Mother's parental rights, we decline to remand this case for further factual findings on one element of the failure to manifest ground."); *In re Rosylyn W.*, No. E2019-01838-COA-R3-PT, 2020 WL 6053523, at *13 (Tenn. Ct. App. Oct. 13, 2020) (finding "a remand to the Trial Court for further consideration of this ground to be unnecessary due to our ultimate conclusion affirming the termination of Father's parental rights on another ground"). Permanent placement of a child "'should not be unnecessarily delayed due to a remand for findings on alternate grounds.'" *In re Adaleigh M.*, 2021 WL 1219818, at *9 (quoting *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003)).[13]

Based on the foregoing discussion, we reverse the trial court's finding that "severe child abuse" under Tennessee Code Annotated section 36-1-113(g)(4) served as a ground for termination of Mother's parental rights.

### B. Best Interest of the Children

Having found that DCS has established at least one ground for termination of Mother's parental rights, we must now determine whether termination of Mother's rights is in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c); *In re Gabriella D.*, 531 S.W.3d at 681. At the time DCS filed its petition in May 2020, Tennessee Code Annotated section 36-1-113(i) listed the following best interest factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

---

[13] As we previously discussed, Father's parental rights are not at issue in this appeal. We note, however, that the trial court's finding that Father sexually abused L.V.F., his stepdaughter, is not lessened in anyway.

- 19 -

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The relevancy and weight to be given each factor depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d at 878. Although courts are instructed to consider each factor, a court is not required "to find the existence of each factor before it concludes that terminating a parent's rights is in the child's best interest." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *16 (Tenn. Ct. App. Apr. 20, 2016) (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)). Application of the best interest factors must be viewed from the perspective of the child, not the parent. *In re Gabriella D.*, 531 S.W.3d at 681. If the best interest of the child and the interest of the parent conflict, such conflict must always be resolved in favor of the child. *Id.* at 681-

82.

As we have previously discussed, Mother has several unresolved issues, including continued use of illegal drugs, pending criminal charges, a lack of employment, and an inability or unwillingness to respond to DCS. Mother has failed to adjust these circumstances—and in certain instances they have worsened—despite the assistance provided by DCS. Ms. Cremeans testified that since the children first entered DCS custody, she met with Mother multiple times to discuss the requirements of the permanency plans and that she referred Mother to programs to help complete certain requirements. She also attempted to coordinate with Mother to administer drug screens and to verify the state of Mother's employment and suitability of her new home. Many of these efforts were thwarted by Mother. As a result, we find that factors (1) and (2) weigh in favor of termination.

Since L.V.F. and K.E.K. first entered DCS custody, Mother visited the children only one time. Although at times Mother was prohibited from visiting, Mother made no effort to lift the February 2020 no contact order. Further, the children do not share a meaningful relationship with Mother. L.V.F. stated that she is in favor of Mother's rights being terminated; the foster mother testified that K.E.K. does not remember anyone except his siblings and the foster parents, whom he perceives as his parents; and K.G.K. entered DCS custody when she was only a few days old, making Mother "essentially [a] stranger[]" to K.G.K. *See In re Braelyn S.*, 2020 WL 4200088, at *21. For similar reasons, removing the children from their current caretakers and physical environments is likely to cause them harm. The children are thriving and healthy in their current foster placements. Factors (3), (4), and (5) also weigh in favor of termination.

Under factor (6), the older children were removed from the home after allegations of abuse of L.V.F. by Father, truancy charges regarding L.V.F, and Mother's drug use. Ms. Cremeans testified that Mother continued to associate with Father after the children entered DCS custody. Mother also testified that Father continues to harass her. Although Ms. Cremeans testified that, at one point, Father continued to reside with Mother, it appears that he no longer resides in Mother's home. However, all of the children were adjudicated dependent and neglected while in Mother's care. Therefore, factor (6) weighs in favor of termination.

When Mother changed residences, Ms. Cremeans stated that she was unable to verify the suitability of Mother's new home. Regardless of the physical aspects of Mother's new home, it is clear that Mother continues to consume illegal substances, rendering her consistently unable to care for the children in a safe and stable manner. Factor (7) weighs in favor of termination.

There was no proof presented on Mother's mental or emotional status (other than her continued drug use). Therefore, we find factor (8) to be inapplicable.

- 21 -

The record indicates that Mother made a large child support payment in May 2020. Thereafter, Mother continued to consistently provide child support of varying amounts. Thus, we find that factor (9) weighs against termination.

After considering all of the applicable factors from the perspective of the children, we find that it is in the best interest of the children to terminate Mother's parental rights.

## V. CONCLUSION

Based on the foregoing discussion, we affirm the trial court's findings that DCS has proven four grounds for termination of Mother's parental rights by clear and convincing evidence. However, we reverse the finding of "severe child abuse" as a ground for termination. We also affirm the finding that it is in the best interest of the children to terminate Mother's parental rights. As a result, we affirm the trial court's order to terminate Mother's parental rights to the children.

This case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are assessed against Appellant, Jamye K., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE